IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ANTHONY NEAL,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **04-636-DRH** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**PROUD, Magistrate Judge:**

This Report and Recommendation regarding plaintiff Anthony Neal's appeal of the Social Security Administration's decision to terminate plaintiff's Disability Insurance Benefits and Supplemental Security Income is respectfully submitted to U.S. District Judge David R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

In July 1993, plaintiff Anthony Neal was deemed disabled for purposes of receiving Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), with an onset date of June 14, 1991. **(Doc. 10, Record ("R."), pp. 21-23).** At that time, Administrative Law Judge Glay E. Maggard concluded plaintiff satisfied 20 C.F.R. § 404, Subpt. P, App. 1, § 1.05C (a presumptively disabling musculoskeletal impairment), suffering from degenerative disc disease, status post lumbrosacral spinal fusion and insertion of instrumentation in January 1993. **(R. 22).** In May 2004, in accordance with 20 C.F.R. §§ 404.1594 and 416.994, Administrative Law Judge Anne C. Pritchett determined that, despite plaintiff's assertions to the contrary, plaintiff's eligibility for SSI and DIB ceased because plaintiff had shown medical improvement as of March 1, 2000, and through the date of decision, that enabled him to perform light

1

exertional work, including past work as a security guard. **(R. 11-18).** Plaintiff's appeal of that decision was denied by the Social Security Administration Appeals Council, making it the final agency decision. **(R. 3-5).** Pursuant to 42 U.S.C. § 405(g), plaintiff is now before the Court seeking review. **(Docs. 1 and 20).**

## Issues Presented

Plaintiff Neal argues that ALJ Pritchett erred in finding that plaintiff's description of his limitations and complaints was exaggerated. **(Doc. 20).** Plaintiff focuses on his April 2004 testimony about his level of pain and impairment, stressing that in some situations pain alone can be disabling, even if unsupported by objective evidence. **(Doc. 20, pp. 7-8).** From plaintiff's perspective, his medical history reveals that he attempted to return to work multiple times, but back pain repeatedly terminated his attempts at work and plagued him through the date of decision. **(Doc. 20, pp. 8-11).** Plaintiff accuses the ALJ of highlighting portions of the record that support her conclusions, while ignoring other sections of the record– plaintiff's testimony and documented complaints of severe pain and limitation– all in contravention of 20 C.F.R. § 416.929(c)(4) and *Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999). **(R. 20, pp. 12-13).**

Citing 20 C.F.R. §§ 404.1594(b)(6) and 416.994(b)(1)(vi), as well as *Sopher v. Heckler*, 754 F.2d 222, 224 n. 1 (7th Cir. 1985), the defendant Commissioner stresses that in a cessation determination there is an inference that the claimant's disability continues, but there is no presumption of continuing disability. **(Doc. 23, pp. 6-7).** The defendant argues that there is substantial evidence in the record to support the decision that plaintiff had medical improvement in March 2000, and that plaintiff was not credible. **(Doc. 23, pp. 8-13).** The defendant notes that the initial disability determination was made only six months post fusion, and that medical

2

records show improvement through March 2000.  **(Doc. 23, pp. 9-11).**  Defendant argues that plaintiff's exaggerations are clearly documented and his subjective complaints of pain and limitation are contradicted by medical records; therefore, the ALJ correctly concluded plaintiff was not credible.  **(Doc. 23, pp. 11-12).**  More to the point, defendant contends there is no objective evidence to support plaintiff's allegations of pain and impairment.  Accordingly, defendant reasons that there was evidence to support the ALJ's conclusions that plaintiff could perform his past work.  **(Doc. 23, p. 12).**

## Synopsis of the Cessation Decision

In her 2004 decision, Administrative Law Judge ("ALJ") Pritchett acknowledged that at all relevant times plaintiff Neal suffered from "severe" deficits from an L5-S1 lumbrosacral spinal fusion, as well as "severe" polysubstance abuse.  **(R. 15 and 17).**  However, the ALJ did not find that those two impairments met or equaled the presumptively disabling impairments listed at  20 C.F.R. § 404, Subpt. P, App. 1.  **(R. 15 and 17).**  Compared to plaintiff's documented condition on July 30, 1993 (the date of the initial disability determination), medical improvement was found as of March 1, 2000.  **(R. 12-15 and 18).**  In making that determination, ALJ Pritchett discounted plaintiff's testimony about his limitations, concluding that plaintiff had exaggerated his complaints and the effects of his ailments, and finding no support in the medical record.  **(R. 16 and 18).**  Based on the testimony of vocational expert Dr. John Grenfell, who characterized work plaintiff had performed in 1996 as a security guard as "light," "semi-skilled" work, ALJ Pritchett concluded that plaintiff could still perform his past work as a security guard.  **(R. 15, 17-18).**  In addition, the ALJ noted that Dr. Grenfell had identified other "light" jobs a person of plaintiff's age with a similar education and work experience could perform, if he were

limited to light work.  **(R. 17-18).**

ALJ Pritchett's decision outlined plaintiff's medical history post fusion, highlighting that medical records reflect that 13 months after surgery plaintiff was significantly better, and he was able to return to work in May 1994, 16 months post fusion.  **(R. 13).**  The ALJ also found it significant that for almost a three year period between 1996 and 1999 plaintiff did not seek medical treatment for his back ailment.  **(R. 13).**  Although plaintiff received medical treatment for a period beginning in the later part of 1999, the ALJ notes that plaintiff reported in February 2000 that his back was doing very well.  **(R. 13).**  Plaintiff was notified in March 2000 that his benefits would cease.  **(R. 30-32).**

ALJ Pritchett's conclusion that plaintiff was not credible was key to the finding that there was no intervening period of disability between the March 1, 2000, cessation point and the final decision in May 2004.  The ALJ highlighted that when plaintiff sought treatment in January 2003, he stated that he had injured his back dancing, and it was documented that plaintiff had exaggerated his prior medical history and impairment.  **(R. 14).**  The ALJ also honed in on plaintiff's recorded statements that he ran and played basketball in 2003.  **(R. 14).**  Indications of prescription drug abuse and the use of illegal drugs also played into the ALJ's decision.  **(R. 14).**  The ALJ also relied upon records from a pain treatment clinic as evidence of plaintiff's exaggerations and his objectively documented condition.  **(R. 14-15).**

### Applicable Legal Standards

4

To qualify for DIB or SSI, a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

When assessing whether a beneficiary's disability continues or ends, an eight-step sequential analysis is applied:

(1) Is the beneficiary working? If yes (and if there is no issue of a trial work period), the beneficiary is no longer disabled.

(2) If a beneficiary is not working, do his or her impairments meet or equal a presumptively disabling impairment listed at 20 C.F.R. § 404, Subpt. P, App. 1? If yes, disability is continued.

(3) If the beneficiary's impairments do not meet or equal the Listings, has there been any medical improvement? If yes, the sequential analysis proceeds to step four; if no, it proceeds to step five.

(4) Is the medical improvement related to the beneficiary's ability to work? If yes, the sequential analysis proceeds to step six; if no, it proceeds to step five.

(5) If there is no medical improvement, or if the medical improvement is not related to the beneficiary's ability to work, does one of the exceptions to medical improvement apply? If an exception does apply, the beneficiary is no longer disabled. If none of the exceptions apply, the sequential analysis continues.

(6) If medical improvement is related to the ability to work, are all current impairments severe in combination? If not, the beneficiary is no longer disabled.

      (7)      If the impairments are severe, the Commissioner determines the beneficiary's residual functional capacity (RFC) and considers whether he or she can do his or her past work. If the beneficiary can, he or she is no longer disabled.

      (8)      If the beneficiary cannot do his or her past work, the Commissioner decides whether the beneficiary can do other work given his or her RFC, age, education, and work experience. If the beneficiary can, he or she is no longer disabled; if not, disability is continued.

*See* **20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(b)(5)(i)-(vii).** The point of comparison for assessing medical improvement is the time of the most recent medical decision that plaintiff was disabled. **20 C.F.R. §§ 404.1594(b)(1) and 416.994(b)(1)(i).** It is undisputed that the comparison point date in this situation is July 30, 2003, the date of the disability determination that is at issue.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff was, in fact, disabled, but whether ALJ Pritchett's findings were supported by substantial evidence; and, of course, whether any errors of law were made. *See* ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no

contradictory evidence.  *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

## Summary of Pertinent Evidence

Plaintiff Neal underwent a lumbrosacral fusion at L5-S1 in October 1992.  **(R. 193-194).**  In July 1993, the initial disability determination was made.  **(R. 21-23).**  When plaintiff saw his surgeon Dr. Rolando M. Puno in on May 11, 1994, 16 months post fusion, plaintiff reported that he had gone back to work, but was experiencing some non-radiating back pain.  **(R. 123).**  Plaintiff thought he had had significant improvement from the surgery, but he did report some days with significant pain.  **(R. 123).**  Upon examination, plaintiff was found able to bend 45 degrees, x-rays were also taken, and Dr. Puno concluded there was a high probability that the fusion was solid at that point in time, and plaintiff should return in six months, at which time the possibility that plaintiff would have to be retrained for a different line of work would be considered.  **(R. 123).**  Plaintiff was prescribed Tylenol 3.  **(R. 123).**

Plaintiff rechecked with Dr. Puno in October 1994, one year and nine months post fusion, at which time he reported that was doing "fair," but was experiencing stiffness and "mild" discomfort.  **(R. 123).**  Plaintiff could bend forward 70 degrees, and after viewing updated x-rays, Dr. Puno concluded the fusion was solid. **(R. 123).**  The doctor planned to see plaintiff in six months and, if there was no change, see plaintiff on a yearly basis.  **(R. 123).**

Plaintiff fell in November 1994 and was experiencing "significant" non-radiating back pain.  **(R. 123).**  However, Dr. Puno concluded plaintiff was "actually doing fairly well," and prescribed a three week course of physical therapy and recheck in two or three months.  **(R. 123).**  Records indicate plaintiff was working at this time.  **(R. 123).**  When Dr. Puno examined plaintiff again in April 1995, he could almost touch his toes.  **(R. 122).**  Dr. Puno agreed to

plaintiff's request for three more weeks of physical therapy, and a return exam in six months. **(R. 122).** Plaintiff subsequently was prescribed another three weeks of therapy, which would theoretically take plaintiff to almost the end of May 1995. **(R. 122).** Plaintiff failed to appear for scheduled appointments with Dr. Puno in October 1995, April 1996 and August 1996. **(R. 122).**

Plaintiff returned to see Dr. Puno August 27, 1996, at which time it was noted "[h]e was actually doing well and has actually kept two jobs; however in the last two months he has been having more back pain." **(R. 121).** Dr. Puno examined plaintiff, took x-rays, and concluded plaintiff should stay off work for about one week. **(R. 121).** Plaintiff was again prescribed physical therapy, Motrin 600 mg, Tylenol 3 and a "High Knight" brace. **(R. 121).** Plaintiff did not return to see Dr. Puno in October 1996 as planned, and there is no record of treatment until March 1, 1999. **(R. 120-121).**

In March 1999, Dr. Puno recorded that plaintiff had not been seen since 1996, but that he had been doing well, having returned to work for a roofing company. **(R. 120).** Although x-rays showed a solid fusion, plaintiff was experiencing pain; Dr. Puno questioned whether the instrumentation in plaintiff's back needed to be removed. **(R. 120).** Plaintiff was prescribed physical therapy, electric stimulation and a TENS unit, and was scheduled to be seen again in about a month. **(R. 120).** Plaintiff continued treatment and in May 1999, after a myelogram, Dr. Puno concluded plaintiff had hypomobility and listhesis Grade 1 just above the fusion site, suggesting the need to extend the fusion. **(R. 118).** However, by July 1999, Dr. Puno again concluded the fusion was solid, and plaintiff should merely continue physical therapy and medication, and come back in one year. **(R. 117).** A February 16, 2000, examination revealed

that, after physical therapy, his back is doing "very well," and he had been trying to go back to work part-time, but work had hurt his back and he was not working at that time. **(R. 116).**

In March 2000, plaintiff was notified that he was no longer considered disabled, as of March 1, 2000, with actual cessation of benefits in May 2000. **(R. 30-32).**

Between April 24, 2000, and June 28, 2000, plaintiff continued treatment for intersegmental instability; plaintiff was described as ambulatory with a cane. **(R. 113-114).** At this juncture, plaintiff stopped treating with Dr. Puno in Kentucky and moved to Illinois. **(*See* R. 224).** There is no record of treatment until January 2003, when plaintiff sought emergency treatment for a back injury he stated he received while dancing. **(R. 169).** Plaintiff reported to hospital staff that he had had 11 back surgeries. **(R. 169).**

When plaintiff reinjured his back, he began treatment with Dr. Sahni in Carbondale, Illinois. **(R. 224).** Plaintiff told Dr. Sahni that he had been wheelchair bound between 1993 and 1998; that he had surgery in 1994, and again in 1999 to repair a spinal leak; that he played basketball and went running; and that he had only been taking Ibuprofen for the past three months and had been well enough to go dancing. **(R. 224).** Dr. Sahni did not find plaintiff very forthcoming, and referred plaintiff to a pain management clinic, rather than prescribing more Tylenol 3. **(R. 224).**

Plaintiff returned to Dr. Sahni February 24, 2003, and was doing so well he was able to walk around unassisted and "even jumped down from the examining table without any assistance and without any complaint of pain." **(R. 222).** However, a month later, in March 2003, plaintiff was reportedly using a cane half the time and having pain, so Dr. Sahni instructed plaintiff to go to a pain clinic for a neural block and return in six months. **(R. 221).** Records from the pain

9

clinic from late February 2003, indicate plaintiff was able to walk a straight line with a limp, but unable to walk heel to toe. **(R. 234).** Plaintiff was diagnosed with lumbar facet joint arthropathy, lumbar post laminectomy syndrome, even though symptom magnification was noted in five of nine categories when tested. **(R. 234 and 247-250).** According to Dr. Rivera, the range of motion in the lumbrosacral spine was reduced by 25%, and extension and lateral flexion were reduced by 8% with moderate pain. **(R. 246).** Although plaintiff rated his pain as 8-10 on a 10 scale, Dr. Rivera thought, based on plaintiff's subjective statements, that plaintiff was capable of sitting for 10-15 minutes at a time, standing for 15-30 minutes, walking one mile, but unable to stoop, lift, carry, kneel, squat, reach or push and pull. **(R. 237 and 242-243).** However, Dr. Rivera also noted that plaintiff thought himself capable of performing the activities of daily living. **(R. 238).**

Plaintiff did undergo a series of epidural pain blocks from March through December, 2003**. (R. 222-232).** However, plaintiff's prescriptions for Tylenol 3 were cutoff when he tested positive for cocaine in September 2003. **(R. 229).** Having tested negative for cocaine in December 2003, plaintiff was placed back on Tylenol 3. **(R. 228).** At the time of plaintiff's last two pain blocks in September and December 2003, plaintiff reported that the combination of epidural blocks and medication gave him 50% relief. **(R. 228-229).**

In April 2004, plaintiff testified he constantly experienced pain he rated 7-8 on a 10 scale, and that he had to use a cane because his legs gave out. **(R. 272 and 274).** Plaintiff reported that he constantly had to lay down, he could stand for only ten minutes, and sit for less than 20 minutes. **(R. 276).** Plaintiff stated that he does cook a little, but he lays down while the food cooks. **(R. 279).** Plaintiff described his drug use as "once upon a time," but when the ALJ

mentioned the positive drug screen, plaintiff stated he last used drugs a month or two ago.  **(R. 281).**

Vocational expert Dr. John Grenfell characterized plaintiff's past work as a mix of unskilled, semi-skilled and skilled work, with city beautification as being semi-skilled requiring exertion in the light to medium range.  **(R. 282-283).**   Of particular relevance is plaintiff's work as a security guard and at a packing company, both jobs performed at the light exertional level.  **(R. 283).**  Dr. Grenfell testified that a hypothetical person of plaintiff's age and with his work experience, who could perform a reduced range of light work lifting 20 pounds occasionally and ten pounds frequently, and sit for up to four hours per day (the factor reducing the range of work), could still perform plaintiff's past work as a security guard, which allows one to alternate sitting and standing.  **(R. 283).**  Alternate jobs such a person could perform include an unskilled surveillance monitor at the sedentary level, of which there are approximately 6,500 such jobs in the Illinois; order clerk, also at the sedentary level, of which there are approximately 6,000 such jobs; and sedentary inspection work, of which there are less than 4,000 such jobs.  **(R. 283-284).**  In contrast, if plaintiff's testimony were fully credible, Dr. Grenfell opined that plaintiff's pain, rated at 7-10 on a 10 scale, and his need to lie down for at least half the day would preclude all work.  **(R. 284-285).**

## Analysis

Plaintiff's claim that his disability continues is premised primarily upon his pain. Plaintiff asserts that in some situations pain alone can be disabling, even if unsupported by objective evidence.  Therefore, if ALJ Pritchett erred in finding plaintiff's testimony exaggerated and not fully credible, then, based on plaintiff's statements and Dr, Grenfell's expert opinion,

plaintiff could not work.

Pain is inherently difficult to assess, and some ailments, fibromyalgia for example, often must be assessed primarily by the claimant's subjective complaints. **See Sarchet v. Chater, 78 F.3d 305, 306-307 (7th Cir. 1996).** However, a claimant's subjective complaints need not be accepted insofar as they clash with other evidence in the record. **See 20 C.F.R. §§ 404.1527 and 404.1529.**[1] An ALJ is in the best position to judge a witness's truthfulness, and an ALJ's credibility determination will be overturned only if it is patently wrong. **Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir.2005).** In making a credibility determination, an ALJ must give specific reasons for the finding that are supported by the record. **See Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).** "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." **Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994).**

There is ample evidence to doubt plaintiff's credibility. When plaintiff sought treatment in January 2003, he told emergency room staff he had injured his back dancing, but just three days later Dr. Sahni observed that plaintiff was not clear about why he had sought treatment, only acknowledging that he had injured his back dancing when the doctor confronted him with the emergency room notes. **(Compare R. 169 and R. 224).** Similarly, plaintiff told emergency treaters that he had been taking Vicodin, but he told Dr. Sahni he was only taking Ibuprofin. **(R.**

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations/Section 404 out of convenience.

**224).** Similarly, plaintiff told emergency treaters he had had 11 surgeries, but he did not report such an exaggerated medical history to Dr. Sahni. **(R. 224).** Dr. Rivera performed a number of cross-checks to assess whether plaintiff was exaggerating his symptoms; plaintiff was found to be exaggerating in five of nine categories. **(R. 234 and 247-250).** Plaintiff told ALJ Pritchett that he used a cane because his legs gave out, and he had to constantly lay down throughout the day due to his constant pain, which he estimated to be 7-10 on a 10 scale. **(R. 272, 274 and 276).** However, plaintiff did not report those limitations to Dr. Rivera or Dr. Sahni, who last treated him. Plaintiff initially testified before ALJ Pritchett that his illegal drug use was "once upon a time," but when confronted with a documented positive test for cocaine more than six months earlier, plaintiff admitted having last used drugs a month or two before the hearing. **(*Compare* R. 229 *and* R. 280-281).** All of the aforementioned discrepancies and outright lies (and others) were noted in the ALJ's decision and cited as the basis for the ALJ's conclusion that plaintiff was "less than fully credible." **(R. 14-16).**

Moreover, the objective medical evidence in the record contradicts plaintiff's claims of pain and limitation and substantiates medical improvement since July 30, 1993, and the residual functional capacity for light work.[2]

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. §§ 404.1567(b) and 416.967(b).**

With respect to medical improvement after July 30, 1993, the record reveals that by May 11, 1994, plaintiff had returned to work, 16 months post fusion. **(R. 123).** Because plaintiff was continuing to experience non-radiating back pain, Dr. Puno projected that, if the pain continued for another six months, plaintiff might have to consider being retrained for a *different* line of work– no mention of plaintiff not working was made. **(R. 123).** By April 1995, after additional physical therapy and continued medication (Tylenol 3), plaintiff could touch his toes. **(R. 122).** From October 1995, until late August 1996, plaintiff failed to keep appointments with Dr. Puno. **(R. 122).** On August 27, 2006, Dr. Puno described plaintiff as "doing well," and noted that plaintiff had kept two jobs. **(R. 121).** Although plaintiff was experiencing back pain, Dr. Puno only recommended that plaintiff stay off work for "about one week." **(R. 121).** Again, there is no indication that Dr. Puno considered plaintiff unable to work. More telling is the fact that plaintiff did not seek additional treatment for two and a half years. **(R. 120-121).** Dr. Puno's notes indicate plaintiff had returned to work at a roofing company. **(R. 120).**

Despite the aforementioned medical improvement, when Dr. Puno began treating plaintiff again in March 1999, he had concerns about whether the original fusion needed to be extended. **(R. 118).** By July 1999, Dr. Puno though continued medication and physical therapy were the solution, and upon examination in February 2000, plaintiff was reported to be doing "very well," and trying to go back to work part-time– indicating plaintiff himself thought he was capable of working. **(R. 116).** It is at this juncture that the initial cessation determination was made, effective March 1, 2000. **(R. 30-32).**

Although plaintiff continued treatment with Dr. Puno through June 2000, he was

described as ambulatory, with a cane.  **(R. 113-114).**  Plaintiff did not seek treatment again for another two and a half years.  In addition to the gap in treatment suggesting that plaintiff was markedly improved, it is telling that plaintiff only sought treatment in January 2003 after he injured his back dancing.  **(R. 169).**  By plaintiff's own account, he had also been capable of playing basketball and running.  **(R. 224).**  It is at this point that plaintiff's exaggerations and lies began, thereby casting doubt on his subjective reports of pain and limitation through the date of decision.

In February 2003, Dr. Sahni reported plaintiff was doing so well he was able to walk around unassisted and "even jumped down from the examining table without any assistance and without any complaint of pain" **(R. 222)**– hardly indicative of a man who said his pain was 7-10 on a 10 scale, and who had to use a cane and lay down all the time.  **(R. 237).**  By plaintiff's own admission, he thought himself capable of performing the activities of daily living– walking, sitting, standing, climbing stairs, dressing himself and living unassisted.  **(R. 238).**  At the time of plaintiff's last recorded treatments, when he received epidural pain blocks, he indicated he was obtaining 50% relief of his pain with the pain blocks and medication.  **(R. 228-229).**  Thus, there is substantial evidence in the record to support the ALJ's conclusion that not only had plaintiff obtained medical improvement as of March 1, 2000, but he had the residual functional capacity for light work.

## Recommendation

For the aforestated reasons, it is the recommendation of this Court that the Social Security Administration's decision to terminate plaintiff's Disability Insurance Benefits and

Supplemental Security Income based on cessation of disability as of March 1, 2000, be affirmed in all respects, as that decision is supported by substantial evidence in the record.

 

**DATED:  July 18, 2006**　　　　　　　　　　s/ Clifford J. Proud
　　　　　　　　　　　　　　　　　　　　　　**CLIFFORD J. PROUD**
　　　　　　　　　　　　　　　　　　　　　　**U. S. MAGISTRATE JUDGE**

### Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **August 4, 2006**.